UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| Tracy Turner,<br><br>                            Plaintiff,<br><br>v.<br><br>BNSF Railway Co.,<br><br>                            Defendant. | Case No. 4:23-cv-681<br><br>**COMPLAINT**<br>(JURY TRIAL DEMANDED) |

## INTRODUCTION

1.      The Federal Railroad Administration (FRA) requires railroads to assess whether their trainmen have the visual acuity necessary to recognize and distinguish colored railroad signals. The FRA does not require that trainmen have perfect color vision to be licensed, but instead recognizes that color vision deficiency ranges in severity from very mild to severe, some of which may prevent an employee from safely operating a train and most of which will not. 49 C.F.R. § 242.117(h)(3); Best Practices for Designing Vision Field Tests for Locomotive Engineer or Conductors, 80 Fed. Reg. 73,122, 73123–24 (Nov. 24, 2015) ("Best Practices for Designing Vision Field Test") ("FRA's longstanding view is that there are some people who, despite not meeting the vision threshold in 49 CFR 240.121(c) and 242.117(h), have sufficient residual visual capacity to safely perform as a locomotive engineer or conductor.") The FRA therefore tasks railroads with determining not whether an employee suffers from a color-vision deficiency, but whether the employee can safely do his/her job despite such deficiency.

1

2. Tracy Turner was a trainman for BNSF Railway Co. who could distinguish signals despite, like one in twelve men, suffering from a genetic anomaly that causes him to be color-vision deficient. For a decade and a half, BNSF tested and licensed Turner every three years, as required by the regulations. Never in that fifteen years did Turner ever misread a railroad signal while driving a train for BNSF.

3. In 2020, BNSF nevertheless revoked his license, claiming his color-vision deficiency now prevented him from safely doing his job. Nothing about Turner's vision had changed. Rather, BNSF this time used a field test that did not replicate what he must actually see to be able to safely do his job to assess his color vision. BNSF relied solely on his failure of that test to revoke his license, ignoring the mountain of evidence demonstrating that he can sufficiently distinguish between railroad signals despite being color-vision deficient.

4. Using tests that do not replicate what employees must actually see to justify discriminating against them on the basis of their color vision and ignoring contrary evidence is exactly the type of discrimination that is prohibited by Americans with Disabilities Act (ADA). Turner has therefore filed this case, and he asks the Court to order BNSF to undo the wrong it has done to him.

## PARTIES

5. Turner is an individual who resides and worked for BNSF in this district.

6. BNSF is a railroad carrier engaged in interstate commerce that is headquartered and operates in this district.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BNSF is headquartered in this district, Turner resides in this district, and a substantial part of the events or omissions giving rise to his claims occurred in this district.

## FACTUAL ALLEGATIONS

9. The FRA requires that railroads assess whether their trainmen have the visual acuity necessary to recognize and distinguish colored railroad signals. 49 C.F.R. Part 242 Appx. D.

10. First, trainmen must take a clinical exam, like the *Ishihara* test, without chromatic lenses. 49 C.F.R. §§ 240, App. F(2)-(3).

11. Those who do not pass are to be sent to the railroad's medical examiner for further evaluation. 49 C.F.R. §§ 240.121(e), App. F(4).

12. Such evaluation may include "[o]phthalmologic referral, field testing, or other practical color testing[,]" with or without chromatic lenses. 49 C.F.R. §§ 240, App. F(3)-(4).

13. These evaluations are not dispositive either; rather, the medical examiner must "review all pertinent information," explicitly including consultation with the employee's supervisor, to determine whether the employee can safely do his or her job despite being color vision deficient. 49 C.F.R. §§ 240.121(e), App. F(4).

14. Importantly, employees may be certified even if their color vision deficiency prevents them from safely operating under circumstances from which they can be restricted instead of outright decertified, *e.g.*, driving at night. 49 C.F.R. §§ 240.121(e), App. F(4).

15. The latitude the FRA grants to railroads to license trainmen who are color-vision deficient recognizes that there are some people who, despite not meeting the vision threshold in 49 CFR 240.121(c) and 242.117(h) have sufficient residual visual capacity to safely perform as a locomotive engineer or conductor.

16. The latitude railroads are given accounts also for the likelihood of harm from a missed signal not being as significant as one might expect. Under Section 104 of the Act Rail Safety Improvement Act of 2008, railroads had to implement positive train control, GPS technology that can stop a train and prevent train-to-train collisions, over-speed derailments, and unauthorized train movement. Trainmen should therefore no longer be able to cause an accident, no matter how many signals they miss.

17. Further, trainmen do not work alone. Engineers and conductors work in teams, with each being responsible for reading signals. This redundancy significantly decreases the risk of harm from one of them misreading a signal, to the point it is probably zero.

18. Turner has worked as a trainman for BNSF since 2005.

19. Like one in twelve men, Turner suffers from a genetic anomaly that causes him to be color-vision deficient.

20. Turner's color-vision deficiency will neither improve nor worsen over time.

21. BNSF knew Turner was color-vision deficient when it hired him.

22. Turner passed BNSF's color-vision test and was licensed by BNSF every year it tested him until 2020.

23. In 2020, BNSF had Turner submit to a field test that did not mirror what he must see in the field.

24. The test violated the Best Practices for Designing Vision Field Tests at 73124, which dictates that "the test offered by a railroad must be a valid, reliable, and comparable test."

25. BNSF also prohibited Turner from wearing monochromatic lenses on the test.

26. Turner failed the test.

27. Based solely on his failure, BNSF revoked his license, effectively terminating him.

28. Had BNSF tested Turner using a test that mirrored what he must see to be able to safely do his job, he would have passed it.

29. Had BNSF considered Turner's history of safely doing his job and the other pertinent evidence demonstrating his ability to safely do his job, it would have licensed him.

30. Since BNSF did neither, its effective termination of Turner violates the ADA.

## CAUSES OF ACTION

### COUNT I
### DISABILITY DISCRIMINATION, IN VIOLATION OF THE ADA

31. Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of "disability."

32. "Disability" means (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

33. "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

34. At all relevant times, Turner was an individual with a "disability" under the ADA.

35. Turner is a qualified individual under the ADA.

36. Discriminating on the basis of disability under the ADA includes using "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability[.]" 42 U.S.C. § 12112(b)(6).

37. Discriminating on the basis of disability also includes failing to accommodate employees' disabilities when doing so would be reasonable.

38. BNSF discriminated against Turner on the basis of disability when it refused to recertify and effectively terminated him.

39. BNSF discriminated against Turner on the basis of disability when it used a test that did not mirror what he must actually see to screen him out.

40. BNSF discriminated against Turner on the basis of disability when it failed to accommodate him.

41. Because BNSF violated 42 U.S.C. § 12112, Turner has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount to be determined by the trier of fact. Turner is also entitled to attorneys' fees and costs

incurred in connection with these claims.

42. BNSF committed the above-alleged acts with reckless or deliberate disregard for Turner's rights. As a result, Turner is entitled to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Turner prays for judgment against BNSF as follows:

43. That the practices of BNSF complained of herein be determined and adjudged to constitute violations of the ADA;

44. For an injunction against BNSF and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

45. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in an amount to be determined by the trier of fact;

46. For an award of punitive damages for the maximum amount allowed by statute;

47. For an award of pre-judgment interest, as provided by law;

48. For an award of Turner's costs, disbursements and attorneys' fees pursuant to law;

49. For all relief available under the ADA;

50. For such other and further relief available by statute; and

51. For such other and further relief as the Court deems just and equitable.

June 30, 2023

**COUNSEL FOR PLAINTIFF**
MACLEAN LAW FIRM, P.C.
/s/ Scotty MacLean
**Scotty MacLean**
State Bar No. 00787942
4916 Camp Bowie Blvd.
Ft. Worth, TX 76107
Phone: 817-529-1000
Facsimile: 817-698-9401
smaclean@macleanfirm.com

CASEY JONES LAW
Nicholas D. Thompson (MN389609*)
3520 Cherryvale Avenue, Suite 83
Appleton, WI 54913
Phone: (757) 477-0991
nthompson@caseyjones.law
*Pro Hac Vice application forthcoming*

8